Good morning. Good morning, Your Honors. I'm not sure if it's on. You can adjust that. Are you feeling, does she have sound? Maybe. Or maybe I'm just being quiet. Okay. Are we good? Yeah, you can use either your court voice or your mom voice or your louder voice if you want, so we can hear you. Sounds good. Good morning, Your Honors. Katie Hurlbrink on behalf of Mr. Cuadrado. Government psychiatrist Dr. Badre provided four categories of inadmissible and unreliable evidence that undermined Mr. Cuadrado's insanity defense. He testified falsely about his credentials, violating NAPU. He testified that Mr. Cuadrado was not credible, violating Rule 702A. He said that he saw Mr. Cuadrado smoking methamphetamine on video, even though the court repeatedly deemed that opinion unreliable. And despite defense efforts to challenge reliability generally, he never, the court never made any express reliability findings. For each and all of these reasons, this court must reverse. I'll begin with NAPU. Dr. Badre's false testimony satisfies all three NAPU prongs. Well, I'm most interested in your NAPUI issue because it's presented, we get a lot of NAPUI issues, but this is one that's a little bit different in terms of the timing because it happened before the jury got the case. All right. It happened while it was going on. A lot of times with NAPUI, we'll get things on habeas cases that'll be many years later, and then people are arguing how it would have affected things. And in this situation, everyone's got the information before the jury's gone out. And so that puts it in a little bit of a different status there. And so even assuming that Dr. Badre's testimony regarding his position and title was false and that the government knew it was false, what's your best argument that it was material? What is your best case establishing that a false statement as to an expert's title means materiality standard under NAPUI? And does the fact that you're not challenging Dr. Badre's other credentials, such as his academic credentials, does that affect the materiality or why or why not? And you also found out in a way that you were able to cross-examine him on I'm not sure if it was you or the person that did the trial. And so that means the jury was presented with the evidence showing that the expert made a false statement, if you want to say that, and defense was free to argue that the evidence was false in closing. So how does that all all of those things, how does that affect your NAPUI argument? Sure, Your Honor. So I'll begin with Your Honor's question about the defense learning about the falsehood prior to the case being submitted to the jury. That's true. But the defense was not able to effectively cross-examine Dr. Badre because we received the email from the vice chair about eight minutes before court. We did present it to the government and to Dr. Badre, but the government objected to hearsay. So that email was never presented to the jury. They never received actual evidence that that Dr. Badre was not truthful. And then separately, Dr. Badre doubled down. We asked him, you're not the director of forensic training, are you? Something to that effect. And he responded, yes, I am. And so and then, of course, the government repeated in closing argument that Dr. Badre was the director of forensic training. So all the jury got was evidence that Dr. Badre was the director of forensic training. But Dr. Badre conceded he was a volunteer. He was not paid. He was not tenured. He was not permanent faculty. He was not currently teaching. That his appointment letter didn't give him the title of director of forensic training. Conceded there's no forensic psychiatry fellowship program at UCSD. Conceded he was an assistant voluntary professor. He didn't complete a fellowship in forensic psychiatry. So why does it matter? Yes, your honor. So you were able to get or your colleague was able to get all of those concessions on cross. Correct. And so I take your honor's point. Why did the title matter? And the answer is two reasons. First, it provided a source of legitimacy that Dr. Badre's resume was otherwise severely lacking. So to be clear, while Dr. Badre admitted all of the things that you mentioned, Judge Koh, he also repeated, I am the director of forensic training. So he he never admitted that those things made him not have a directorship. And the directorship provided a source of peer recognition that he otherwise did not have. Dr. Badre, despite this self-proclaimed forensic specialty, had not even published one article, peer reviewed article in forensics. He had no residency to bring that out on cross. He hadn't published anything. Yes, your honor. All right. So so so that was our argument is that, you know, he doesn't have any peer recognition. But Dr. Badre was able to to point to the fact that a prestigious university had conferred a directorship over forensics on to him. They don't just hand those out like candy. They they hand a prestigious university handing out a directorship like that indicates a respect for and a value for the person. But the trial judge said this is a nomenclature thing. And so that has said this isn't it's not a misrepresentation. And so we have to review that for what? Clear error? Whether? No, your honor, because the NAPU prongs are reviewed de novo. And one of the prongs is falsehood. So falsehood is refute is reviewed de novo. If if the district court made underlying factual findings about what happened, that would be reviewed for clear error. Well, I guess it would be shockingly. I have two doctorate degrees, honorary doctorate degrees from various universities that I've been involved in. And so if I call myself Dr. Callahan and then you cross examine me and say, oh, well, this is just an honorary degree. Right. And what did you have to do to do that? Well, you know, I was on the board of directors or I was on the regents or this, that and the other. I did that. Well, OK, I'm not a real Ph.D. You've established that. And I didn't do, you know, which is much the same as what Judge Koh said about Dr. Baudry. So no one would confuse me for, you know, a Ph.D. from Cambridge or, you know, Oxford or something like that. So, I mean, it's just like, OK, call yourself whatever you want. Call me Dr. Callahan. But it's I don't I don't have a Ph.D. But I think the distinction, Your Honor, is that a university actually conferred that honorary degree on you. And that means something. That means something about your status and your stature. But here, no one actually conferred a prestigious directorships. You say that, but Dr. Baudry never claimed that Dr. Light personally gave him that title. Right. That's correct, Your Honor. Dr. Baudry claimed that the program director of psych psychiatric residency conferred the title. Correct. That's correct. And is there anything in the record, a declaration or even an unsworn statement from the program director of psychiatric residency saying I did not allow him to use that title? Well, a couple of things on that, Your Honor. First of all, the director of residency training was cited in the email that Dr. Light sent around. And he agreed that this title did not exist. Plus he. But that's that's not a declaration. Is this Mr. McCarthy? Is that your understanding of who this is? When I Google who's the program director, residency training director, that's who comes up. I haven't looked at information outside of the record. Was the email from that was cited? It was from Dr. Light. So Your Honor is correct that it that it wasn't, you know, sworn testimony from the director of residency training. But Dr. Light, neither were Dr. Baudry's supporters emails. And Dr. Light did provide himself a sworn declaration confirming his. To put a finer point on it, this does Dr. Light's declaration rule out the possibility that someone in the hierarchy between light at the top and Baudry, this program director. I think his name is McCarthy, but we just know program director told Baudry, you're the you're the director of forensic training, maybe to get him to come do the job in the first place. And then McCarthy was embarrassed that he gave a title that didn't exist or that light was angry about and either forgot to tell Dr. Light that or maybe changed his tune in front of Dr. Light. These sort of there's anything in the record. Will that out? I wouldn't say it rules that out, Your Honor. But the fact that five top tier faculty agree that this position didn't exist makes it unlikely. And to the extent that I'm not really disputing that the faculty say this is not in the hierarchy, there's no such position. But isn't it within at least the realm of possibility that underling sometimes do things that they're not authorized to do? You know, inferior officers sometimes. For instance, I have a there's a member of my court's clerk's office whose title is courtroom deputy clerk. And I refer to her sometimes in my judicial assistant because she performs that duty for me. That's not her official title. It's nowhere in the hierarchy of our court. But if she were to claim she was my judicial assistant, would that be literally false because it's not in the HR chart? So it would. So I'm not sure about the in terms of your judicial assistant. But the here, Dr. Baudry, you know, claimed to have a directorship that does not exist. So I think that's a different question. But to answer your honor's hypothetical, I think that's highly unlikely. Given the evidence in the record, there is no evidence that that happened. And whose fault is that? I mean, this is an approved claim. Right. And so under Ninth Circuit law, your client have the burden to show that this testimony was knowingly false. Actually, under Ninth Circuit law, when there is credible evidence brought to the government's attention that they're that they're witness testified falsely. They have to investigate. They have a duty to investigate. So if they thought that maybe that happened, Dr. Baudry should have told them and they should have gotten information from that person. I've lived the same life I've lived and they get information and they get a he said, he said situation. Are they required to believe one party or the other? Or could they just look at it and say, Baudry says this unnamed program director gave me the title. Light says the title doesn't exist in the HR chart. Light doesn't actually dispute that it's possible the program director did give Baudry the title. We don't know. That's what cross examinations for. That's what discovery is for. But ultimately, Dr. Baudry did not provide what he what Dr. Baudry provided to the prosecutors was not any information from. Let me ask you this. All right. Would you concede that your case would be your case is weaker because you had an opportunity to cross examine on this information as opposed to that? You discovered this a year later after the verdict had come in. Your Honor, I do not think our claim is weaker in as much as we were never able to put that information before. All right. But you did. But this is a different NAPUI claim than what you concede. It's a little bit different than a NAPUI claim where you have you don't even have the information while you are trying the case. You have no opportunity to cross examine. It's factually different. But I don't think it makes a difference when it comes to the NAPUI prongs in this particular state. It's a distinction without a difference. But you are saying it's a difference. It is a factual difference. But in this particular case, it is a distinction without a difference. Do you want to save any time for rebuttal? Yes, Your Honor. All right. Let me find out if my colleagues have any more questions before I let you step away. I did want to just clarify. So your briefs stop short of saying that Dr. Baudre knowingly lied or committed perjury. Is that still you're not saying that he knowingly lied or perjured himself. Correct. I didn't see that in your briefing. Your Honor, I don't know if he lied and the district court didn't make any findings. But under this court's precedent, it does not matter. Hayes versus Brown holds that NAPUI, by its terms, addresses the presentation of false evidence, not just subordination of perjury. And many circuits, the Fourth Circuit, the Seventh Circuit and the Third Circuit all agree. Right. But our circuit also says an honestly mistaken recollection doesn't satisfy prong one of NAPUI. Let me ask you a second question. Your briefs don't argue that the government should have known about Dr. Baudre's incorrect title prior to trial. I just want to confirm that is your position that you're arguing that the duty to investigate was triggered once you presented the doctor light email during the cross. That's correct, Your Honor. We have no reason to think the prosecutors knew about it before. OK. All right. Thank you. All right. I will give you two minutes for rebuttal. Thank you. May it please the court. Daniel Zip on behalf of the United States. Your Honor, as you noted, the case law in the circuit is that honestly mistaken witness recollections do not rise to the level of actual falsity for NAPUI purposes. Dr. Baudre's testimony in this case was based on this letter says that he can only use voluntary assistant clinical professor or a voluntary professor. So how could he. I'm just looking at his appointment letter. He never got anything in writing that I've seen that authorizes that title. That's correct. And why didn't the government know in advance that he didn't have that title. He provided us with a seven page CV with literally hundreds of lines of qualification. We had no way to know or suspect that one or any of those was incorrect. Does the Web site for UCSD in any way confirm that title. I don't know. So you didn't check. You didn't check to see what the Web site confirm. No, we didn't go through this title, go through his CV and sort of double check all of his claims. He did testify that the director of residency training, as your honor noted, had given him this title. That appears to be a different person than the people that are listed in the email from Dr. Light. And more fundamentally, he testified what his role was. And there's no real dispute that he was the person in charge of giving all 14 lectures required for all residents to graduate in the field. He testified he gave 30 lectures. That was also false. Correct. In his cross, he says, I gave 30 lecture. I think he was referring to his total, not just in the forensics area. I don't know that that was false. He said in the last year I've given 30 lectures right in the psychiatry department at UCSD. And it's not it's inconsistent with the records you provided as to which classes he taught. Those were just he said, I teach 14 forensics and then I teach other classes as as asked by the faculty. You told the district court or your counsel or whomever in your office. There's no dispute that there was no one at UCSD with the title of director of forensic training. Why doesn't that concession meet prong one of Napoli? I think the fact that that Dr. Light. Or that the faculty says this, this position does not exist. Doesn't mean that that Mr. Dr. Badre's testimony is actually false for the purpose of NAPURI. He's known at UCSD with that title. How could that statement in any way be true? And you conceded or your your office conceded there's no one at UCSD with the title of director. Sure. At the very least, even if as an objective fact, that is not true. Certainly, Dr. Badre did not knowingly present that false statement to the to the jury. He believed that that was his testimony of that. I mean, you look at the appointment letter. It's very specific. As to what his title is. The evidence of that is his testimony that he had been given that title by the director of residency training. His presentation of e-mails from Dr. Abrams that said that he was the prior director and he had told his sort of predecessors, the person that took his position, that he could use that title and several letters referring to him using that title. And again, the fundamental fact that what he was doing was directing the training for of forensics for all residents at the UCSD. Hypothetically, that we find the testimony regarding Dr. Badre's title and position was false testimony. Assume it hypothetically. What is your best argument that the government did not know it was false testimony after seeing the e-mail from UCSD stating that Dr. Badre held no such position and that no such position existed? Sure, Your Honor. Well, first of all, the defense never provided this information to the prosecutor until in the middle of cross examination. They sort of flashed it up on the screen while cross examining him. So this is that was the first that we had seen it. As Your Honor noted, at this point, there was sort of a he said he said versus what Dr. Light said in an e-mail which we didn't receive and only had a chance to read on the screen. What follow up investigation revealed other people at the university or associated with the university disagreed with. That universe of information doesn't rise to the level of knowledge in the way that the cases in this court, which typically involved a prosecutor who has a cooperation agreement with a witness who knows firsthand that what that witness is saying about the cooperation agreement is false. That's fundamentally different from sort of factual issues that are based on inconsistencies or honest witness recollections that we have no way on the fly. People at UCSD that confirmed this title. But other than Dr. Abrams with David Lehman, that's an e-mail with. No information as to who David Lehman is, what his relationship, if any, with UCSD is. Right. The e-mail has no at all identification of David Lehman's affiliations. That's correct. So how are we to assume that you said there are multiple people at UCSD that verified this title? Are you putting David Lehman in that category? No. I think I said multiple people associated with UCSD. And who is that other than Abrams? The director of residency training whose name we don't have. And there's nothing in here. There's no letter from that person. There's no e-mail from that person saying it's pure speculation. Well, it's testimony from Dr. Baudry. Right. But presumably in the time that you got that letter, Dr. Baudry was contacting a bunch of people to get this e-mail from Dr. Abrams and Dr. Lehman. Presumably he contacted people who were actually officially associated with UCSD during that time as well and could not get any verification of his title. Otherwise, I assume you would have provided it. It was a two- to three-hour period while the jury was deliberating. I don't know what he did during that time, but those are the e-mails that we provided, that he provided to us during that time period. But, again, all of that sort of at most creates a disagreement or inconsistency about what his title was. It's not the same sort of actual falsity the government should have known about or did know about, certainly while the trial was going on. And even afterwards, once we received that information, we conducted additional investigation. We determined that there was a dispute over this and actually agreed that we would stipulate that the director of forensics training was not his title. Ultimately, the NAPUI claims are fundamentally claims of prosecutorial misconduct, a sort of purposeful distortion of the truth-finding process. Can I just circle back to the first element of that claim? You stipulated that no such title exists, but have you stipulated away the first element of the NAPUI claim, or are you reserving the argument that – No, we are reserving the argument. This testimony could have been literally true in that this unnamed program director did allow him to use that title, maybe even use it himself, and you just don't know whether that happened or not. It's not in the HR charts. It's not an official title. It might have been an unofficial title, and so you're disputing whether there's falsity? That's correct. In fact, if you look in our supplemental excerpts of records, when we submitted our response to the motion for a new trial, we specifically said we agreed to stipulate that there is no title, but we did not agree that he testified falsely, that Dr. Light and the administration may not have that title. He fundamentally believed that that was his title based on what he had been told by his predecessor in that position. Do you think that's what the district court meant by nomenclature issue? Is it an official title versus an unofficial title, that sort of thing? Yes, I think that's what, again, not to circle back, his testimony about what his role was at the university is undisputed, and the question is whether that qualifies him as a director or a volunteer lecturer in charge of all forensics training. That is an issue of nomenclature, as the district court found, and it is not objectively false. Again, as the court found after hearing from Dr. Badre, seeing how he performed under cross-examination, this was not sort of a purposeful lie on his part. It was a dispute over nomenclature. Let me ask you this. I think in your brief you note this case was not a battle of the experts, despite defense counsel framing it as one. Given that the mental health and mental state of Cuadrado was central to the defense, can you explain how it was not a battle of the experts' case? What evidence outside of expert testimony did the government present to rebut Cuadrado's insanity defense? Sure. The reason it wasn't a battle of the experts, first of all, our case in chief didn't involve any expert testimony. It only came up as an affirmative defense from the defense of insanity. And the reason it's not a battle of the experts is because what the experts ultimately testified to wasn't that far apart. Dr. Victoroff testified that Cuadrado was suffering from a controlled substance use disorder and also testified that he was schizophrenic. Dr. Badre testified essentially that he was suffering from methamphetamine use disorder and was not schizophrenic. But ultimately what the jury had to decide was whether he was so mentally ill that he was unable to appreciate the nature and quality or wrongfulness of his conduct. Whether he was sort of schizophrenic or methamphetamine use-induced schizophrenic, there's substantial evidence, as the court found, that he could appreciate the nature of his actions and the wrongfulness of his acts. Are there facts that would make this not effecting this in terms of, because I believe this is the postal worker's gone mad type of thing. He was a postal worker, right? Yes. And the person that was injured and got his head sliced was also working for the post office? Right. So these people knew each other? Yes. So aside from what any of the doctors said, what was the evidence about what happened here? The evidence was videotape from the 7-11 showing sort of an argument between supervisor and supervisee. Evidence of him throwing Mountain Dews at the window of the car of the supervisor and then shoving him into the car. Evidence of him driving back to the facility, getting out of his truck, going to his personal van, coming back to the truck. And then when the supervisors asked him to return his badge, sort of coming out of the truck, pushing one, stabbing the other in the head, and then critically leaving the scene then, pulling out to the gate, backing up so it would open more quickly, then giving an obscene gesture with his hand to the camera on the way out, and then ultimately disposing of the knife as he drove away. There's also the evidence that when he was arrested days later, he gave a post-arrest statement in which he admitted that he felt bad about what happened, but when officers asked him if he would sign a written apology to his victim, he said only if you drop the charges. So all of that evidence, wholly independent of any experts on either side, showed that he was aware of what he was doing and that he was able to appreciate the quality and wrongfulness of his conduct. I want to go back to the materiality of the third prong on Napui. Separate from what was Dr. Badre's exact role, function, title at UCSD, why wouldn't the dispute about whether he's the director of forensic training at UCSD be material to his credibility? Is this someone who lies? Is this someone who shades the truth when it's helpful to himself, when he thinks it's going to promote his efforts as an expert witness? Why wouldn't that be material? Going just straight to credibility, is this a truthful, honest person? Sure. Who really squares the corners or not? The main answer to that is that the defense had this information and they cross-examined him about it, and he admitted in a way that he hadn't admitted on direct examination that he was only a voluntary professor, that he only worked less than part-time. But he didn't concede that he wasn't the director of forensic training. Right. He didn't concede that. The letter didn't come in. Your office made a successful hearsay objection, which I actually think is correct, that email from Dr. Light is hearsay, but he didn't actually concede that he was not. I mean, the jury never knew that he was not the director of forensic training. Right? Because the clarification was never made during their deliberations. So the jury assumed he was the director of forensic training when they rendered their verdict. He was cross-examined on the issue and admitted his much more limited role. They used that in closing and said, why did he sort of puff up his title at the beginning? Even if at that point the court had stopped all proceedings, it's still sort of an open question as to whether he honestly was lying when he said that or that he believed that. But it's not an open question that there's no director of forensic training at UCSD. You've conceded that. Yes. So to your point, had at that point the United States paused all proceedings, entered a stipulation, conducted an investigation, and the jury was presented with a cross-examination that was done by the defense and a stipulation that his title is not director of forensics training, ultimately that would not change his overall credibility in a way that would undermine all of the evidence I just outlined that has nothing to do with the expert testimony or the simple fact that the jury heard a stipulation by the United States government that their key witness is not what he says he is, that that would not be material to assessing that witness's credibility. Material in the sense that it would affect the outcome of the trial? Yes. As the district court said, I don't find for a second, given all the evidence here, that this dispute over whether he was the director or some other title, when all of the evidence about what he actually did was the same, wouldn't for a second make a difference in the jury's outcome, that they would consider the fact that Mr. Quadrato was unable to appreciate the nature and quantity and wrongfulness of his conduct based on this one dispute over the directorship? Whether it's material in the sense that it would be one more thing for the defense to use, it's certainly not material in the legal sense that it would have a reasonable possibility of changing the outcome of trial, given all of the evidence that this defendant was well aware of what he was doing and was aware of the wrongfulness of his conduct. All right. Do either of you have any additional questions? No, thank you. All right. We've used your time. Thank you. All right. You have two minutes for rebuttal. Two minutes. And I'll start with where the government, or pick up where the government left off, which is with materiality. I think Judge Koh really hit the nail on the head with saying that this not only provided an extra boost to Dr. Baudry's resume, but knowing that he testified falsely would have really impacted his credibility. Do you have any case saying that's the focus of the materiality prong? It's not the materiality of the substantive content of the testimony, but just the materiality of the fact that a witness testified falsely? And wouldn't that just collapse the second prong into the first prong? So, Your Honor, in Nippu, the falsehood went only to credibility. So it is black-letter law that a credibility issue based on false testimony can satisfy. When would a jury ever not find it material to know that a witness lied? So, I mean, I think that's a great question. If there is false testimony given, it is a very serious error. And most of the time, reversal is the proper – That's what I mean by doesn't it collapse the two tests? If you just say any time a witness lies, that's material because it affects credibility. I don't think it collapses the – Well, I mean, I was a trial judge. I felt like I probably heard lies every single day I went to court. Okay? But did they affect the outcome?  Yeah. I don't see any case that says because you can identify something that was a lie, that therefore you've automatically – that it's structural error and you've automatically satisfied the second prong. You have that type of case. Oh, no, and that's not our argument. We just – the materiality prong for Nippu is so low, is one of the lowest materiality prongs in law, that if a witness testifies falsely, there is a strong chance that you can meet that third materiality prong. And you could hear – Well, but when someone – these people know each other. You've got an argument going on. You've got – you have him getting rid of the evidence. You have him leaving. You have him doing an obscene gesture as he goes out. That's pretty strong evidence that he knew – and he won't stay there. And then the comments that he made later, it's – you've got to push a rock uphill there to say that you would have gotten a different result. Well, Your Honor, if you look at all of that evidence from the defense point of view, from the defense arguments, all of it makes sense with the defense theory because, for example, we actually provided evidence that he did not make an obscene gesture. He was waving at a driver. People don't always – juries don't always agree with experts that people don't know what they're doing. They look very seriously at the conduct of what the person did as opposed to speculating as to what they might have known or what they think or this, that, and the other. And you've got some strong evidence against you that says he knew exactly what he was doing. Does he enjoy good mental health? Probably not. I would like to think that a person in good mental health would not have done what your client did. But by the same token, did he understand the nature of his acts? Did he understand them to be wrong? That's a whole – that's a tough rock to push uphill. Yes, Your Honor, and that's what I'm trying to explain. We had evidence that would show that the government's narrative was wrong and ours was right. For example, the supposed obscene gesture, we brought a witness to court to say, actually, Mr. Quadrato was just waving at another driver. The disposal of the knife, as Your Honor said, the reason why we think that that would make someone guilty is because they're trying to get rid of the evidence. But here, that doesn't make any sense because multiple witnesses saw Mr. Quadrato commit the assault, so getting rid of the knife wouldn't help. Plus, he didn't try to cover up the crime. He immediately confessed as soon as he was picked up. Or what about leaving the scene? Well, when you confess and you say you know what you did, that's a double-edged sword for you. That means you actually do appreciate what you did. Yes, of course, he does appreciate what he did, but he told the police post-arrest, I did it because I thought they were going to kill me. And that's where the wrongfulness of his actions becomes called into question because he did not know what he was doing was wrong because he thought he was going to be killed, and that comes from his schizophrenic delusions. All right, let me find out. I have one last question. Go ahead, Judge Crow. You agree that forensic psychiatrists can testify about malingering, about exaggeration of symptoms. So your only dispute with Dr. Baudry's testimony, I mean, put aside the title issue, seems to be that he used the word credible and was using that term. But you agree that he could talk about malingering, he could form an expert opinion on exaggeration of symptoms. I agree that he could have said things like, you know, he scored a certain test on this malingering test. But then he can't say, yes, I make a finding that he's malingering? He can say, I think it's probably okay for him to say, I make a finding that he's malingering, or that he was exaggerating his symptoms is the actual finding that he made. But Dr. Baudry went further than that and repeatedly testified that Mr. Quadrato was not credible, and there were two things that made that testimony. But where is the line there, right? Yeah. So I'd say you are repeatedly exaggerating your symptoms. Am I not challenging your credibility inherently? Well, I do think this court's case law draws that line and just simply says you can talk about things that are inconsistent and might indirectly bear on credibility, but you can't directly testify to credibility. And Dr. Baudry did that again and again. That mattered for two reasons. One, because Dr. Baudry made clear that he had not provided the jury with all of the reasons why he thought Mr. Quadrato was not credible. He said, I made a long list of things he said I did not think were credible. I spoke about some of them today. Or as far as when he exaggerated, I'm telling you now, I wrote in my report there are some things that he did that were not credible. Those were some of them. So he wasn't just leaving it to the jury to make their own credibility determination. He was telling them, I know more than you, and I think he's not credible. Additionally, Dr. Baudry— Do you have a— No, thank you. We've been generous with time. Thank you both for your argument. This matter will stand submitted.
judges: CALLAHAN, KOH, Barker